Kevin N. Anderson, A0100
David R. Hague, A11660
FABIAN & CLENDENIN,
  a Professional Corporation
215 South State Street, Suite 1200
Salt Lake City, Utah  84111-2323
Telephone:    (801) 531-8900
Facsimile:    (801) 596-2814
Email:        kanderson@fabianlaw.com
              dhague@fabianlaw.com

*Attorneys for Plaintiff Chad Elie*

## IN THE UNITED STATES DISTRICT COURT

## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| CHAD ELIE,<br><br>          Plaintiff,<br><br>v.<br><br>JEREMY JOHNSON, SUNFIRST BANK, N.A., SUNFIRST CORP., TOWN & COUNTRY BANK, TRIPLE SEVEN LLC, SCOTT LEAVITT, JASON T. VOWELL, TODD L. VOWELL, LOYD JOHNSTON, and KERRY JOHNSON,<br><br>          Defendants. | **VERIFIED COMPLAINT AND JURY DEMAND**<br><br>Case No. _____<br><br>District Judge _____<br><br><br>**FILED UNDER SEAL** |

Plaintiff, Chad Elie ("**Plaintiff**" or "**Elie**"), complains of Defendants Jeremy Johnson ("**Johnson**"), Sunfirst Bank, N.A. and Sunfirst Corp. ("**SunFirst**"), Town & Country Bank ("**Town & Country**"), Triple Seven LLC ("**Triple Seven**"), Scott Leavitt ("**Leavitt**"), Jason T. Vowell and Todd L. Vowell (collectively, the "**Vowells**"), Loyd Johnston ("**Loyd Johnston**"), and Kerry Johnson ("**Kerry Johnson**") (collectively, the "**Defendants**"), and alleges as follows:

## <u>NATURE OF CASE</u>

1.      This action stems from a series of conspiratorial acts undertaken by the Defendants to defraud Plaintiff Chad Elie and to rob him of millions of dollars in profits as a result of a business venture he entered into with Defendant Johnson.  The purpose of that venture was to provide payment-processing services through SunFirst to Plaintiff's most profitable online merchants.  Plaintiff and Defendant Johnson agreed to a 50/50 partnership, equally sharing in the expenses and profits of the business.

2.      As part of this business venture, Plaintiff negotiated several processing agreements with online merchants, including two highly-profitable merchant contracts, which generated approximately $2.5 million in processing revenue per month and resulted in profits of approximately $40 million from November 2009 through November 2010.  However, rather than paying Plaintiff his equal share of profits generated by the venture, Defendant Johnson, with the active and knowing participation of the other Defendants, converted the profits and used them to purchase stock and invest in, among other things:  (1) Airplanes; (2) Real estate; (3) Oil; and (4) Energy deals.  Plaintiff was not a partner or included in any of these deals.  In addition, Defendant Johnson used profits from the business venture to pay his personal income taxes.  Defendant Johnson, with the assistance of his co-conspirators, concealed these investments from Plaintiff by showing him a phony balance sheet indicating that the business venture operated at a loss.  Defendant Johnson also showed Plaintiff a different balance sheet showing that only Defendant Johnson and his cohorts actually profited from this business venture.

3.      Plaintiff has been robbed of profits to which he is entitled as a result of Defendants' conspiratorial acts.  Defendants continue to move and disperse funds belonging to

Plaintiff to various unknown bank accounts.  By this lawsuit, Plaintiff seeks, among other things, an accounting of all of the processing activities through Defendants SunFirst and Town & Country in order to assess the true nature of profits from this business venture and an immediate injunction enjoining the Defendants from spending and transferring the processing revenue and profits due and owing to Plaintiff.

### PARTIES, JURISDICTION AND VENUE

4.      Plaintiff Chad Elie is a resident of the State of Nevada.

5.      Defendant Jeremy Johnson is, and was at all relevant times, a resident of the State of Utah.

6.      Defendant SunFirst is a federally insured savings and loan association with its principal place of business located at 120 East St. George Blvd., St. George, Utah 84770.

7.      Defendant Town & Country is a federally insured bank with its principal place of business located at 405 East St. George Blvd., St. George, Utah 84770.

8.      Defendant Triple Seven is a corporation organized and existing pursuant to the laws of the State of Utah, with its principal place of business located at 543 N. Bluff Street, St. George, Utah 84770.

9.      Defendant Scott Leavitt is, and was at all relevant times, a resident of the State of Utah.

10.     Defendant Jason T. Vowell is, and was at all relevant times, a resident of the State of Utah.

11.     Defendant Todd L. Vowell is, and was at all relevant times, a resident of the State of Utah.

12.     Defendant Loyd Johnston is, and was at all relevant times, a resident of the State of Utah.

13.     Defendant Kerry Johnson is, and was at all relevant times, a resident of the State of Utah.

14.     Subject matter jurisdiction is proper with this Court pursuant to 28 U.S.C. § 1332 since diversity of citizenship exists between the parties, and the amount in controversy exceeds $75,000, exclusive of costs and interest.

15.     Defendants are subject to jurisdiction in this Court as they are all residents of the State of Utah and maintain their principal places of business in this State.

16.     Venue is proper in the United States District Court, District of Utah pursuant to 28 U.S.C. § 1391.

## GENERAL ALLEGATIONS

17.     Plaintiff is the CEO of Viable Marketing Corporation ("**Viable**"), a Florida corporation in the business of selling web-based identity-theft products.

18.     Plaintiff provides Check21[1] e-payment processing solutions for his online merchants whose customers wish to pay over the Internet by check or debits from their banks instead of using their credit cards.

19.     Defendant Johnson is the President and owner of iWorks, Inc. ("**iWorks**"), a Utah-based corporation in the business of selling web-based consumer products through both affiliate marketing and as upsells on other advertisers' web pages.

---

[1] Check21 refers to the Check Clearing for the 21st Century Act.  The act allows the recipient of the original paper check to create a digital version of the original check—called a "substitute check," thereby eliminating the need for further handling of the physical document.

20.     Plaintiff and Johnson became acquainted at a trade show in 2009.

21.     Prior to meeting Plaintiff, Johnson was not familiar with Check21 processing and only dealt with credit card payment processing.

22.     In the fall of 2009, Johnson indicated to Plaintiff that he had developed a trusted relationship with SunFirst, a bank located in St. George, Utah.

23.     SunFirst is a provider of electronic payment transaction processing services that specializes in ACH and Check21 processing for businesses.

24.     As a result of his trusted relationship with SunFirst, Johnson represented to Plaintiff that he was in a unique position to ensure that Plaintiff could successfully process for his online merchants.

25.     Johnson represented to Plaintiff that, in exchange for becoming 50/50 partners, Plaintiff could begin processing for his online merchants through Defendant SunFirst—that is, providing a mechanism for Plaintiff's online merchants to both receive money from their customers and pay out funds to their customers through SunFirst.

26.     Plaintiff and Defendant Johnson further agreed that expenses would be shared equally and profits from this business venture would be distributed quarterly.

27.     This agreement was captured in email exchanges between Plaintiff and Johnson. Indeed, as recently as December 11, 2010, Johnson acknowledged in an email to Plaintiff: "Nobody is trying to say that you are not entitled to half of everything that was made." *See* December 11, 2010 Email, attached hereto as "**Exhibit 1**."

28.     After agreeing to the partnership, Plaintiff entered into various merchant processing agreements and began successfully processing for these merchants through SunFirst in November 2009.

29.     The processing revenue for these merchants ran from SunFirst through an entity known as Triple Seven—a money transmitting business that provides payment processing services and money wires to offshore online merchants.

30.     Defendant Triple Seven is the alter ego of Defendants Jason and Todd Vowell, long-time friends and employees of Johnson, who helped perpetrate the fraud against Plaintiff through that entity.  Defendant Todd Vowell is a former Arthur Andersen Certified Public Accountant who is well known in the St. George community.

31.     Among the new processing agreements that Plaintiff negotiated were two highly profitable merchant contracts, with whom Johnson was not previously familiar and did not previously have any kind of business relationship.

32.     Based on the financial terms contained in the contracts with these two merchants, Plaintiff anticipated profits of $2.5 million per month, less expenses.

33.     The processing revenue for this business venture did indeed exceed $2.5 million per month, generating revenue of over $40 million from November 2009 to November 2010.

34.     This $40 million figure was confirmed in an e-mail dated November 16, 2010 from Defendant Loyd Johnston, a friend and employee of Johnson.  *See* November 16, 2010 Email, attached hereto as "**Exhibit 2**."

35.    In this e-mail, Defendant Loyd Johnston indicates that, at the end of October 2010, the total monthly processing revenue was close to $40 million, with total transactions over $650,000.  (*See* Exhibit 2.)

36.    Defendant Scott Leavitt, Johnson's long-time friend and accountant at iWorks, was responsible for depositing funds from Plaintiff's online merchants into the accounts set up at SunFirst and for handling the finances for the business venture until the Vowells took over that responsibility.

37.    Leavitt, along with Plaintiff and Johnson, had signatory authority over the processing accounts set up through SunFirst.

38.    During the course of the business venture, Plaintiff confronted Johnson several times about the profitability of the business venture and his entitlement to 50% of the profits.

39.    When confronted by Plaintiff, Johnson took Plaintiff to see the Vowells.

40.    Johnson, with the active participation of the Vowells, presented false financial information to Plaintiff, which concealed the true nature of the business venture's profitability for the purpose of defrauding Plaintiff and excluding him from his 50% share of the profits.

41.    Indeed, the Vowells conspired with Defendant Johnson to defraud Plaintiff by presenting him with a phony balance sheet, attached hereto as "**Exhibit 3**," purporting to show the processing revenue for the online merchants and the purported profits for the business venture to which Plaintiff was entitled as a 50% partner.

42.    The phony balance sheet indicates processing revenue averaged close to $2.9 million per month from March 2010 through November 2010.  Remarkably, however, the phony

balance sheet indicates the venture operated at a net loss after accounting for expenses.  (*See* Exhibit 3.)

43.     The phony balance sheet further falsely indicates that Plaintiff purportedly received approximately $6.9 million in payments from this business venture, whereas Johnson only received approximately $2.4 Million in payments.  *Id.*

44.     These false financials created a distorted picture that showed Plaintiff making more money off the venture than Johnson; however, in actuality, the share of profits allocated to Johnson and his co-conspirators far outweighed those allocated to Plaintiff.

45.     The Vowells provided Plaintiff with this falsified information with the intent of presenting a picture to Plaintiff of a less than profitable business venture.

46.     Plaintiff, who was residing in California at the time that the business venture operated, and not being as sophisticated in matters of accounting as the Vowells, and being aware that Defendant Todd Vowell was a former Arthur Andersen CPA, justifiably relied on the false representations made to him by Johnson and the Vowells as to the nature of the business venture's profitability.

47.     At no point during the meetings with the Plaintiff did the Vowells or Johnson reveal to Plaintiff the true financial state of the business venture, but rather, actively conspired with Johnson to conceal this material fact from Plaintiff so that Defendants could convert profits from the business venture for their own personal use.

48.     Defendant Johnson recently showed Plaintiff a different balance sheet for this business venture.  A copy of this different balance sheet is attached hereto as "**Exhibit 4**."

Case 2:10-cv-01273-TS   Document 1   Filed 12/28/10   Page 9 of 31

49.     The different balance sheet shows processing revenue of approximately $2.8 million per month from March 2010 to October 2010.  (*See* Exhibit 4.)

50.     Because the processing began in November 2009, these monthly figures confirm that the business venture reached its anticipated target of $40 million from November 2009 through November 2010, as indicated in Defendant Loyd Johnston's November 16, 2010 email. (*See* Exhibit 2.)

51.     The different balance sheet further indicates that any "loss" was actually the result of millions of dollars of personal expenses that Defendant Johnson expensed through the processing accounts.  (*See* Exhibit 4.)

52.     The different balance sheet clearly indicates that Defendant Johnson siphoned profits from the business venture to make "Other Payments," which included personal investments in TD Ameritrade totaling $5 million and income tax payments of $1,635,633.00. *Id.*

53.     Thus, rather than providing Plaintiff 50% of the profits from the processing revenue as agreed to by the parties, Johnson used the money generated as revenue to invest in private real estate and energy deals to which Plaintiff was not a partner, including:  $632,750.00 payments to AIC; $1,150,000.00 payments to JMD Energy; and $6,401,849.62 payments to Kombi Capital.  Johnson fraudulently concealed these facts from Plaintiff.

54.     Not only did Johnson convert profits due and owing to Plaintiff for the purpose of purchasing stock in oil, but he then transferred 33.3% of that stock to his father, Defendant Kerry Johnson.  *See* Assignment of Stock, attached hereto as "**Exhibit 5**."

55.     Defendant Kerry Johnson intentionally continues to maintain control over 33.3% of that stock despite having knowledge that Johnson, his son, used profits due and owing to Plaintiff to purchase the stock.

56.     Furthermore, Defendant Kerry Johnson is in possession of funds that belong to Plaintiff and assets that were acquired with profits to which Plaintiff is entitled.

57.     Indeed, upon information and belief, Defendant Kerry Johnson has several safes located behind his residence which contain funds and other assets belonging to Plaintiff.

58.     Email correspondence between Defendant Johnson and his co-conspirators show that the processing revenue generated by the business venture was also used by Johnson for personal expenses.

59.     For example, in email communications between Johnson and Defendant Leavitt on May 19, 2010, these Defendants agree to spend part of Plaintiff's investment for personal expenses, including $104,500 for the purchase of a plane and $530,000 for the purchase of oil. *See* May 19, 2010 Email, attached hereto as "**Exhibit 6**."

60.     According to these email communications, Defendants admit to "hav[ing] used some of that money [for personal expenses]" that belonged to Plaintiff.  (*See* Exhibit 6.)

61.     Further, in email communications between Johnson and Leavitt dated July 22, 2010, the Defendants agree to use the line of credit at Defendant SunFirst to pay their own taxes. *See* July 22, 2010 Email, attached hereto as "**Exhibit 7**."

62.     The Defendants have also converted the profits due and owing to Plaintiff and used them to purchase, invest and otherwise acquire various assets, including gold, which is being held by the Vowells.

63.     In October 2010, the Federal Deposit Insurance Corporation ("**FDIC**") began an audit of Johnson's accounts, including the processing accounts maintained at SunFirst resulting from his business venture with Plaintiff.  Upon information and belief, the FDIC's audit was related to an investigation that the Federal Trade Commission ("FTC") was conducting into separate activities that Defendant Johnson and others had been performing before Plaintiff met Johnson by which the FTC was alleging that Defendant Johnson and others with whom he had associated were defrauding consumers through their marketing of worthless goods and services over the Internet.

64.     Johnson learned of the FDIC audit from John Campos, the Vice Chairman of the Board of SunFirst, who was directly involved with the discussions with the FDIC.

65.     When Johnson learned of the audit, he worked closely with SunFirst to transfer monies and funds owed to Plaintiff to Town & Country.

66.     Defendants, without the knowledge or consent of Plaintiff, fraudulently transferred monies due and payable to Plaintiff, which may have resulted in a co-mingling of these funds with monies that Defendant Johnson generated through separate activities that the FTC alleges were fraudulent.

67.     Shortly thereafter, in November 2010, the FDIC froze some of Johnson's bank accounts at SunFirst.

68.     After the FDIC freeze, the FDIC approached Defendant Town & Country and warned the bank against allowing Johnson to process his additional internet activities with the bank.

69.     Notwithstanding the FDIC's advisement, Johnson promised Town & Country that he would invest $5.5 million in the bank if Town & Country would allow him to transfer funds from SunFirst (clearly stolen from processing revenue and due and owing to Plaintiff) to accounts maintained at Town & Country.

70.     Defendant Town & Country was complicit in the fraud perpetrated against Plaintiff by ignoring the warnings of the FDIC and entering into a contract with Defendant Johnson in November 2010 allowing the transfer of these funds, which, upon information, are still being held by Town & Country.  *See* Banking Agreement with Town & Country, attached hereto as "**Exhibit 8**."

71.     Further, Defendant SunFirst actively participated in the conspiracy to defraud Plaintiff and rob him of his profits by allowing the transfer of the stolen processing revenue to Defendant Town & Country and to unknown bank accounts overseas after the FDIC freeze, despite being directly involved in the FDIC investigation.

72.     Plaintiff attempted to contact Defendant SunFirst on several occasions regarding the processing accounts, identifying himself as 50% partner in the business venture, but Defendant SunFirst, actively participating in the conspiracy to defraud Plaintiff, would not discuss the accounts with Plaintiff, stating that they would only discuss the matter with Johnson.

73.     As a 50% partner in this business venture with Johnson, Plaintiff is entitled to an accounting of all of the processing activities through Defendants SunFirst and Town & Country in order to assess the true nature of the profits that he has been denied as a result of Defendants' conspiracy to defraud him and the ensuing FDIC freeze.

74.     In addition to the recovery of his profits, Plaintiff seeks injunctive relief against the Defendants to enjoin them from directly or indirectly spending, moving, transferring, secreting, assigning, conveying, destroying, encumbering, liquidating, or in any other manner disposing of or preventing Plaintiff from recovering the monies belonging to Plaintiff being held in accounts at Defendants SunFirst and Town & Country.

75.     Recent emails obtained by Plaintiff show Defendants' continued efforts to defraud Plaintiff by transferring funds to unknown, and possibly untraceable accounts. *See* Emails dated November 23, 2010, attached hereto as "**Exhibit 9**" (discussing obtaining "a bank [Defendants] can immediately migrate these accounts to in as short as time as possible . . . ." and what "the fees are and approximately how many accounts, types and dollar amounts, that [Defendants] intend to migrate to the new bank . . . .").

76.     By this Complaint Plaintiff further seeks a prejudgment writ of attachment, or such other appropriate order of the Court, over Defendant Johnson's personal property, including his bank accounts maintained in the SunFirst and Town & Country Accounts, automobiles, aircrafts and such other property held by the Defendants that may have been purchased or acquired with Plaintiff's funds.  Plaintiff represents that he has no intention to hinder, delay, or defraud any creditor of the Defendants.

## FIRST CAUSE OF ACTION – FRAUD
### (Against All Defendants)

77.     Plaintiff incorporates all of the allegations in this Complaint as though fully set forth in this cause of action.

78.     As set forth herein, Plaintiff and Defendant Johnson agreed to a 50/50 partnership, equally sharing in the expenses and profits of the business venture, for the purpose of providing

13

Check 21 e-payment processing services to Plaintiff's online merchants through Defendant SunFirst.

79.     Instead of paying Plaintiff his share of profits from the business venture, Defendant Johnson, with the assistance of his co-Defendants, converted the processing revenue for his own personal use and defrauded Plaintiff.

**Who Participated in the Fraud?**

80.     Defendant Johnson, with the assistant of his long-time friends and business associates (Defendants Scott Leavitt, Jason and Todd Vowell, and Loyd Johnston) and the banks with which they did business (Defendants SunFirst and Town & Country) actively worked together to defraud Plaintiff.

**When and Where Did the Fraud Occur?**

81.     Working together, Defendants defrauded Plaintiff and robbed him of profits to which he was entitled as 50% partner from November 2009—the start of the business venture— through November 2010—when the FDIC froze the processing accounts in Utah.  Defendants continue to defraud Plaintiff even post-FDIC freeze by transferring the processing revenue from the Utah bank accounts to unknown, and possibly untraceable bank accounts, and overseas.

**What was the Fraud?**

82.     Defendants worked together to defraud Plaintiff by:

- Converting profits from the business venture for their own personal use to purchase stocks, invest in airplanes, real estate, oil, and energy deals, and pay personal income taxes;

- Expensing millions of dollars of personal expenses as business expenses, which were not in any way related to the business venture, as a way of hiding profits to which Plaintiff was entitled; and

- Transferring, moving, assigning, and secreting the processing revenue to accounts maintained at Defendant Town & Country and to unknown bank accounts overseas post-FDIC freeze;

All of these actions were undertaken by Defendants for the purpose of cheating Plaintiff out of profits to which he was entitled as 50% partner in the business venture.

**How was the Fraud Perpetrated?**

83.     The Defendants actively concealed from Plaintiff the true nature of the business venture's profitability in an effort to rob Plaintiff of profits to which he was entitled as 50% partner in the venture.

84.     Defendant Leavitt was responsible for maintaining control over the business venture's finances and depositing the processing revenue into the accounts held at SunFirst. Leavitt and Johnson, along with Plaintiff, had signatory authority over the processing accounts maintained at Defendant SunFirst.

85.     Leavitt assisted Johnson with converting the processing revenue for Johnson's personal use.  Leavitt's active participation in the fraud is supported by a May 19, 2010 email, in which Johnson and Leavitt agree to spend part of the profits owed to Plaintiff for personal expenses, including for the purchase of a plane and oil.

86.     Leavitt's active participation in the fraud is further supported by an email dated July 22, 2010, in which Johnson and Leavitt agree to use the line of credit at SunFirst to pay their own taxes.

87.     Defendant Loyd Johnston actively participated in the fraud by concealing from Plaintiff the true nature of the profitability of the business venture.  An internal e-mail from Defendant Loyd Johnston dated November 16, 2010 confirms that the online merchants' processing accounts generated profit of $40 million since the start of the venture in November 2009 through November 2010; however, Johnston never revealed to Plaintiff that the business venture had reached its anticipated profit target, but rather assisted Johnson in actively concealing that fact from Plaintiff and presenting to Plaintiff a phony balance sheet.

88.     Defendants Jason and Todd Vowell also took an active role in the fraud and used Triple Seven, a money transmitting business, to perpetrate the fraud against Plaintiff.

89.     Defendant Todd Vowell is a former Arthur Andersen Certified Public Accountant who is well known in the St. George community.

90.     When Plaintiff confronted Johnson about the profitability of the business venture, the Vowells assisted Johnson in presenting Plaintiff with a phony balance sheet that concealed the true nature of the business venture's profitability for the purpose of defrauding Plaintiff and excluding him from his 50% share of profits.

91.     The Vowells provided Plaintiff with this falsified information with the intent of presenting a picture to Plaintiff of a less than profitable business venture.

92.     Plaintiff justifiably relied on the false representations made to him by Defendant Johnson and the Vowells as to the nature of the business venture's profitability.

93.     At no point during the meetings with the Plaintiff did the Vowells reveal to Plaintiff the true financial state of the business venture, but rather, actively conspired with Johnson to conceal this material fact from Plaintiff so that Defendants could convert profits from the business venture for their own personal use.

94.     Defendant Town & Country also actively participated in the fraud by allowing Johnson to transfer the processing revenue to new bank accounts notwithstanding the FDIC freeze and direct warnings from the FDIC not to allow Johnson to process his additional internet activities with the bank.

95.     Defendant SunFirst actively participated in the fraud to rob Plaintiff of his profits by allowing the transfer of the stolen processing revenue to Town & Country post-FDIC freeze, despite being directly involved in the FDIC investigation.

96.     With the assistance of these co-Defendants in perpetrating the fraud against Plaintiff, Johnson was able to use the money generated as processing revenue to invest in private real estate and energy deals to which Plaintiff was not a partner, including: $632,750.00 payments to AIC; $1,150,000.00 payments to JMD Energy; $6,401,849.62 payments to Kombi Capital.

97.     Johnson, without the knowledge and consent of Plaintiff, also made personal investments in TD Ameritrade totaling $5 million and income tax payments of $1,635,633.00.

98.     Johnson fraudulently concealed these investments from Plaintiff and intentionally misled Plaintiff into believing that the business venture was not profitable by showing him a phony balance sheet indicating that Plaintiff, rather than Johnson, had taken millions of dollars out of the business venture.

99.     Plaintiff justifiably relied on the intentional and misleading representations made by the Defendants as to the business venture's profitability and was unaware of their falsity at the time they were made.

100.     However, as set forth herein, the different balance sheet shows processing revenue of approximately $2.8 million per month from March 2010 to October 2010.  (*See* Exhibit 4.)  These monthly figures also confirm that the business venture reached its anticipated target of $40 million from November 2009 through November 2010, as indicated in Defendant Loyd Johnston's November 16, 2010 email.  (*See* Exhibit 2.)

101.     As a direct and proximate result of Defendants' fraudulent conduct, Plaintiff has been damaged in that he has been denied profits to which he is entitled as 50% partner in the business venture with Johnson.

102.     Plaintiff, as 50% partner in the business venture with Johnson, is entitled to the recovery of exemplary and punitive damages for a sum of no less than Twenty Million Dollars ($20,000,000.00), which represents half of the $40 million in processing revenue generated by the business venture from November 2009 through November 2010.

## SECOND CAUSE OF ACTION – CIVIL CONSPIRACY
### (Against All Defendants)

103.     Plaintiff incorporates all of the allegations in this Complaint as though fully set forth in this cause of action.

104.     As set forth herein, Defendants, working together with the common intent to defraud Plaintiff, actively conspired to cheat Plaintiff out of profits to which was entitled as a 50% partner in the business venture.

105.     With the assistance and participation of Defendant Leavitt—who was responsible for depositing the processing revenue into the accounts maintained at Defendant SunFirst—Defendant Johnson stole profits due and owing to Plaintiff as 50% partner and used those monies to expense millions of dollars' worth of personal expenses as business expenses, which were not in any way related to the running of this business venture.

106.     Defendant Leavitt's active participation in the conspiracy to defraud Plaintiff is supported by an email communication dated May 19, 2010, in which the Defendants agree to use part of Plaintiff's profits for personal expenses, including $104,500 for the purchase of a plane and $500,000 for the purchase of oil.

107.     Defendant Leavitt's role in the conspiracy is further supported by a July 22, 2010 email, in which the Defendants agree to use the line of credit at SunFirst to pay their own taxes.

108.     Defendants Loyd Johnston and the Vowells also participated in the conspiracy to defraud Plaintiff by actively concealing from Plaintiff the true nature of the profitability of the business venture.

109.     Johnston did not reveal to Plaintiff that the business venture had reached its anticipated profit target of $40 million, as indicated in Johnston's November 16, 2010 email.

110.     The Vowells conspired with Johnson to defraud Plaintiff by presenting Plaintiff with a phony balance sheet for the purpose of presenting a picture of a less than profitable business venture.

111.     The phony balance sheet falsely indicates that Plaintiff purportedly received approximately $6.9 million in payments from this business venture, whereas Johnson only received approximately $2.4 million in payments.

112.     These false financials created a distorted picture that showed Plaintiff making more money off the venture than Johnson; however, in actuality, the share of profits allocated to Johnson and his co-conspirators far outweighed those allocated to Plaintiff.

113.     Defendants SunFirst and Town & Country also actively participated in the conspiracy to defraud Plaintiff and cheat him out of profits to which he was entitled as 50% partner by allowing the transfer of processing revenue to new accounts held at Town & Country post-FDIC freeze.

114.     SunFirst and Town & Country blatantly ignored the direct warnings of the FDIC to not allow Johnson to process his additional internet activities with Town & Country.

115.     All of these conspiratorial acts were undertaken with the common intent of defrauding Plaintiff and robbing him of profits to which he was entitled as 50% partner in the business venture with Defendant Johnson.

116.     As a direct and proximate result of Defendants' conspiratorial acts, Plaintiff has been denied profits to which he is entitled as 50% partner in the business venture.  Plaintiff has recently discovered that the business venture reached its anticipated target $40 million in processing revenue from November 2009 through November 2010.

117.     Plaintiff, as 50% partner in the business venture with Johnson, is entitled to the recovery of exemplary damages for a sum of no less than Twenty Million Dollars ($20,000,000.00), which represents half of the $40 million in processing revenue generated by the business venture from November 2009 through November 2010.

## THIRD CAUSE OF ACTION – CONVERSION
### (Against Defendants Jeremy Johnson and Kerry Johnson)

118.    Plaintiff incorporates all of the allegations in this Complaint as though fully set forth in this cause of action.

119.    As set forth herein, Johnson intentionally and unlawfully converted profits due and owing to Plaintiff as 50% partner in the business venture for Johnson's own personal use.

120.    Defendant Kerry Johnson converted part of the profits due and owing to Plaintiff as 50% partner in the business venture by accepting and retaining a transfer of 33.3% of Defendant Jeremy Johnson's stock in oil, which Defendant Jeremy Johnson purchased with the processing revenue.

121.    Despite having knowledge that Johnson, his son, purchased the stock using Plaintiff's profits, Defendant Kerry Johnson nevertheless intentionally continues to maintain control over the stock, thus depriving Plaintiff of profits to which he is entitled as 50% partner.

122.    As a direct and proximate result of Defendants Jeremy and Kerry Johnson's intentional and unlawful misconduct in converting profits their own use, Plaintiff has been deprived of profits due and owing to him as 50% partner in the business venture with Defendant Johnson.

123.    Plaintiff, as 50% partner in the business venture with Defendant Johnson, is entitled to the recovery of exemplary and punitive damages for a sum of no less than Twenty Million Dollars ($20,000,000.00), which represents half of the $40 million in processing revenue generated by the business venture from November 2009 through November 2010.

## FOURTH CAUSE OF ACTION – BREACH OF CONTRACT
### (Against Defendant Johnson)

124.    Plaintiff incorporates all of the allegations in this Complaint as though fully set forth in this cause of action.

125.    Defendant Johnson and Plaintiff entered into an agreement to be 50/50 partners in connection with a business processing payments to online merchants through SunFirst.

126.    Plaintiff and Johnson agreed that they would share the expenses and profits of the business equally, and that profits from this business venture would be distributed quarterly.

127.    This agreement was captured in email exchanges between Plaintiff and Johnson.

128.    Plaintiff performed his obligations under the agreement and entered into various merchant processing agreements and began successfully processing for these merchants through SunFirst in November 2009.

129.    Defendant Johnson breached the agreement by, among other things, failing to distribute 50% of the profits to Plaintiff, presenting false financial information to Plaintiff and spending, secreting, or disposing of monies belonging to Plaintiff.

130.    Plaintiff is entitled to profits due and owing to Plaintiff or the proceeds from those that have been spent, secreted, or disposed of by Defendants.

131.    In addition to the recovery of his profits, Plaintiff seeks injunctive relief against the Defendants to enjoin them from directly or indirectly spending, moving, transferring, secreting, assigning, conveying, destroying, encumbering, liquidating, or in any other manner disposing of or preventing Plaintiff from recovering the monies belonging to Plaintiff being held in accounts at Defendants SunFirst and Town & Country.

## **FIFTH CAUSE OF ACTION – UNJUST ENRICHMENT**
### **(Against Defendant Jeremy Johnson)**

132.    Plaintiff incorporates all of the allegations in this Complaint as though fully set forth in this cause of action.

133.    As set forth herein, Plaintiff conferred a benefit upon Johnson by keeping his end of the bargain and introducing two profitable processing accounts to the business venture, which Plaintiff anticipated—based on the financial terms in the contract—would generate $2.5 in processing revenue per month.

134.    Indeed, these two agreements did generate profits of $2.5 million per month as anticipated and approximately $40 million  since the start of the venture in November 2009 through November 2010.

135.    Defendant Johnson converted the processing revenue for his own personal use and expensed millions of dollars' worth of personal expenses as business expenses, which were not in any way related to the running of this business venture.

136.    Accordingly, Defendant Johnson has been unjustly enriched at Plaintiff's expense, by, among other things:

   A.    Failing to pay Plaintiff his 50% share of profits from the business venture;

   B.    Converting profits from the business venture for his own personal use to purchase stocks, invest in airplanes, real estate, oil, and energy deals, and pay personal income taxes;

   C.    Expending millions of dollars of personal expenses as business expenses, which were not in any way related to the business venture, as a way of hiding profits to which Plaintiff was entitled;

   D.    Presenting falsified financial information to Plaintiff to paint a picture of a less than profitable business venture;

23

E.      Transferring, moving, assigning, and secreting the processing revenue to accounts maintained at Defendant Town & Country and to unknown bank accounts overseas post-FDIC freeze; and

F.      Denying Plaintiff access to his profits, which are now held in frozen accounts, unknown bank accounts, and overseas.

137.    Defendant Johnson has admitted, as recently as December 11, 2010, that "Nobody is trying to say that [Plaintiff is] not entitled to half of everything that was made."

138.    Accordingly, Johnson has been unjustly enriched at the expense of Plaintiff, and it would be inequitable to permit Defendant Johnson to retain benefits received from Plaintiff's introduction of his most profitable online merchants to the business venture.

139.    Plaintiff, as 50% partner in the business venture with Johnson, is entitled to the recovery of exemplary damages for a sum of no less than Twenty Million Dollars ($20,000,000.00), which represents half of the $40 million in processing revenue generated by the business venture from November 2009 through November 2010.

## SIXTH CAUSE OF ACTION – ACCOUNTING
### (Against Defendants SunFirst and Town & Country)

140.    Plaintiff incorporates all of the allegations in this Complaint as though fully set forth in this cause of action.

141.    As set forth herein, Johnson worked closely with SunFirst to fraudulently transfer monies and funds to Town & Country which funds are due and owing to Plaintiff as his 50% profits from this business venture.

142.    The transfer of these monies resulted in a co-mingling of these funds with monies belonging to third-party merchants.

143.    In November 2010, the FDIC froze some of Defendant Johnson's bank accounts at SunFirst.

144.    After the FDIC freeze, the FDIC approached Defendant Town & Country and warned the bank against allowing Defendant Johnson to process his additional internet activities with the bank.

145.    Notwithstanding the FDIC's advisement, Johnson promised Town & Country that he would invest $5.5 million in the bank if Town & Country would allow him to transfer funds from SunFirst to accounts maintained at Town & Country.

146.    Defendant Town & Country was complicit in the fraud perpetrated against Plaintiff by ignoring the warnings of the FDIC and entering into a contract with Defendant Johnson in November 2010 allowing the transfer of these funds, which, upon information, are still being held by Town & Country.

147.    Further, Defendant SunFirst actively participated in the conspiracy to defraud Plaintiff and rob him of his profits by allowing the transfer of the stolen processing revenue to Defendant Town & Country and to unknown bank accounts overseas post-FDIC freeze, despite being directly involved in the FDIC investigation.

148.    As a result of the FDIC audit of Defendant Johnson's processing activities, profits due and owing to Plaintiff as 50% partner in the business venture with Johnson have been frozen in accounts controlled by Defendants SunFirst and Town & Country.

149.    The determination of all amounts justly due to Plaintiff, as 50% partner in the business venture, necessarily involves detailed inquiries and accounting of funds being controlled by Defendants SunFirst and Town & Country in the accounts frozen by the FDIC.

150.    Plaintiff has been denied access to these accounts by Defendants SunFirst and Town & Country as a result of the freeze.

151.    Due to the FDIC freeze and without access to those accounts, Plaintiff cannot reasonably ascertain the true profits that are due and owing to Plaintiff as a result of the business venture with Defendant Johnson.

152.    Furthermore, even with liberal discovery, Plaintiff cannot ascertain, or reasonably be expected to ascertain, the extent of funds having been transferred from the processing accounts overseas with the knowledge and approval of Defendants SunFirst and Town & Country.

153.    Plaintiff respectfully requests that this Court order Defendants SunFirst and Town & Country, at their sole expense, to conduct a true and accurate accounting of all of the processing activities and assets of the business venture to assess the true nature of the business venture's profits, believed to be around $40 million and to which Plaintiff is entitled as 50% partner with Defendant Johnson.

## SEVENTH CAUSE OF ACTION – INJUNCTIVE RELIEF
### (Against All Defendants)

154.    Plaintiff incorporates all of the allegations in this Complaint as though fully set forth in this cause of action.

155.    As set forth herein, as a result of the FDIC audit of Defendant Johnson's processing activities, profits due and owing to Plaintiff as 50% partner in the business venture with Defendant Johnson have been frozen in accounts controlled by Defendants SunFirst and Town & country.

156.    Those accounts that have not been frozen by the FDIC, and to which Plaintiff has been denied access by Defendants SunFirst and Town & Country, are still under the control of Defendants, and Defendants continue to transfer the processing revenue to unknown, and possibly untraceable, bank accounts and overseas.

157.    If the Court does not enjoin Defendants from continuing to spend, transfer, move, and/or hide the processing revenue, and ultimately profits due and owing to Plaintiff as 50% partner in the business venture, Plaintiff will be irreparably harmed.

158.    Court action is necessary to protect the monies belonging to Plaintiff as 50% partner in this venture  Without a court order enjoining the transfer of these funds, Defendants will continue to convert funds belonging to Plaintiff, and being held at these banks, for their own personal use.

159.    Defendants continue to have access to funds in the accounts that have not been frozen by the FDIC and could regain access to funds in the frozen accounts should the FDIC lift its freeze, which could happen at any point in time.

160.    If Plaintiff's monies that are being held at Defendants SunFirst and Town & Country continue to be dissipated, Plaintiff will have no adequate remedy at law.

161.    Based on the allegations in the Complaint, Plaintiff has a clear legal right to the request relief.

162.    The public interest will also be served by this injunction because it will prevent Defendants from profiting by their criminal actions.

163.    Therefore, Plaintiff respectfully requests this Court to enter judgment enjoining Defendants from directly or indirectly spending, moving, transferring, secreting, assigning,

conveying, destroying, encumbering, liquidating, or in any other manner disposing of or preventing Plaintiff from recovering the monies belonging to Plaintiff being held in accounts at Defendants SunFirst and Town & Country.

## EIGHTH CAUSE OF ACTION – PRE-JUDGMENT WRIT OF ATTACHMENT
### (Against Defendants Johnson, Kerry Johnson, and Vowells)

164.    Plaintiff incorporates all of the allegations in this Complaint as though fully set forth in this cause of action.

165.    Plaintiff is entitled to a pre-judgment writ of attachment over Defendant Johnson's personal property, including his bank accounts maintained at SunFirst and Town & Country, automobiles, aircrafts, and other such personal property as may have been purchased or acquired with Plaintiff's funds.

166.    Plaintiff is also entitled to a pre-judgment writ of attachment over the safes located at Kerry Johnson's residence and over the gold being held by the Vowells.

167.    Such personal property of Johnson's, Kerry Johnson's and the Vowell's is not earnings and is not exempt from execution.

168.    Plaintiff does not seek a pre-judgment writ to hinder, delay or defraud a creditor of Defendant Johnson, Kerry Johnson, or the Vowells.

169.    There is substantial likelihood that Plaintiff will prevail on his underlying claims for relief.

170.    Upon information and belief, Johnson, Kerry Johnson, and the Vowells have assigned, disposed of or concealed, or are about to assign, dispose of or conceal, their personal property with the intent to further defraud Plaintiff.

171.    Plaintiff has a special interest in Johnson's, Kerry Johnson's and the Vowell's personal property for the reasons herein alleged.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for judgment as follows:

A.      For a Temporary Restraining Order, Preliminary Injunction and, if necessary, permanent order of this Court restraining and enjoining Defendants;

B.      For a pre-judgment writ of attachment over Defendant Johnson's personal property, including his bank accounts maintained at SunFirst and Town & Country, automobiles, aircrafts and such other personal property as may have been purchased or acquired with Plaintiff's funds;

C.      For a pre-judgment writ of attachment over Kerry Johnson's safes located at or behind his residence.

D.      For a pre-judgment writ of attachment over the gold being held by the Vowells.

E.      For monetary damages no less than $20,000,000, in the precise amount to be proven at trial;

F.      For pre- and post-judgment interest at the rate allowed by law or by contract;

G.      For exemplary damages for the sake of example and by way of punishing Defendants, in an amount to be proven at trial;

H.      For reasonable attorney fees and costs as allowed by law or by contract; and

I.      For such other relief as the Court deems just and equitable.

## JURY DEMAND

Plaintiff demands a trial by jury on all causes of action so triable.

DATED this 28th day of December, 2010.

Kevin N. Anderson
David R. Hague
FABIAN & CLENDENIN,
 a Professional Corporation
*Attorneys for Plaintiff Chad Elie*

## **VERIFICATION**

Chad Elie, under penalty of perjury, declares: (1) that he is the Plaintiff in the foregoing action; (2) that he has read the foregoing Verified Complaint and knows the contents thereof; (3) that he believes the factual allegations set forth therein, except those stated to be on information and belief, to be true and correct based on his own personal knowledge and based on documents, records and information compiled by representatives and agents of Chad Elie, and (4) that he believes the aforementioned documents, records and information compiled by representatives and agents of Chad Elie to be accurate.

I declare under penalty of perjury under the laws of the United States of America and the State of Utah that the foregoing is true and correct.

Executed on December  28 , 2010.


_____
Chad Elie